## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

JAMES R. P.,[1]

     **Plaintiff,**

                              **Civil Action 2:22-cv-1867**

     **v.**                             **Magistrate Judge Chelsey M. Vascura**

**COMMISSIONER OF SOCIAL
SECURITY,**

     **Defendant.**

## OPINION AND ORDER

Plaintiff, James R. P. ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying his application for a Period of Disability and Disability Insurance Benefits ("DIB"). This matter is before the Court on Plaintiff's Statement of Errors (ECF No. 10); the Commissioner's Memorandum in Opposition (ECF No. 13); Plaintiff's Reply (ECF No. 14); and the administrative record (ECF No. 7). For the reasons that follow, Commissioner's non-disability determination is **AFFIRMED**, and Plaintiff's Statement of Errors is **OVERRULED**.

## I.      BACKGROUND

Plaintiff protectively filed his DIB application on February 9, 2012, alleging that he had been disabled since May 2, 2002. (R. 14, 241–47.) After Plaintiff's DIB application was denied

---

[1] Pursuant to this Court's General Order 22-01, any opinion, order, judgment, or other disposition in Social Security cases shall refer to plaintiffs by their first names and last initials.

administratively (R. 100, 147), [2] a hearing was held on September 4, 2014, before Administrative

Law Judge Anne Shaughnessy ("ALJ Shaughnessy") (R. 25–58), who issued an unfavorable

determination on September 25, 2014 (R. 11–27). When ALJ Shaughnessy's determination

became final (R. 1–5), Plaintiff sought judicial review in this Court, and the matter was remanded.

(R. 1413–14, 1415–29.) Upon remand, ALJ Shaughnessy held a hearing on January 31, 2018 (R.

1369–91), before issuing a second unfavorable determination on February 28, 2018 (R. 1434–54).

On February 13, 2019, however, the Appeals Council reviewed the matter and remanded it (R.

1455–60) to another Administrative Law Judge, Christopher Tinsdale ("ALJ Tinsdale"), who held

a hearing on December 4, 2019 (R. 1353–68), before issuing a third unfavorable determination on

March 4, 2020 (R. 1326–52). Upon review, the Appeals Council again remanded the matter on

September 16, 2021. (R. 1305–11.)

On January 25, 2020, Administrative Law Judge Melinda Wells ("ALJ Wells") issued a

fourth unfavorable determination. (R. 1239–67.) Because Plaintiff did not file exceptions, and the

Appeals Council did not independently assume jurisdiction, that fourth determination became

final 61 days later pursuant to 20 C.F.R. § 404.984(d).

---

[2] The record indicates that Plaintiff was found to have become disabled on February 8, 2012, for
purposes of Title XVI. (R. 148.)

Plaintiff timely seeks judicial review of that final determination. He asserts that remand is warranted for a number of reasons.[3] First, Plaintiff posits that ALJ Wells erred when considering medical opinion evidence from treating sources (Drs. Popper and Davis) and non-treating sources (Drs. Rutherford and Holzapple).[4] (Pl.'s Statement of Errors 4–8, ECF No. 10.) Next, Plaintiff appears to maintain that ALJ Wells erred by failing to find that Plaintiff's urinary impairment was severe. (*Id.* at 8–9.) Plaintiff also submits that ALJ Wells erred when incorporating into Plaintiff's residual functional capacity ("RFC")[5] certain social interaction restrictions and when finding that the restrictions that were incorporated did not prohibit him from performing jobs identified by a vocational expert ("VE"). (*Id.* at 9–11.) In addition, Plaintiff contends that ALJ Wells erred when performing a subjective symptom analysis. (*Id.* at 11–12.) Plaintiff last argues that ALJ Wells

---

[3] Plaintiff's Statement of Errors is replete with unclear and incomplete statements that possibly attempt to advance additional errors other than those set forth in the "issue" headings. As such, the Court has addressed every argument that Plaintiff has reasonably set forth—but it is not the Court's function to comb through the entire record to develop an argument on Plaintiff's behalf or to take the portions of the record cited by Plaintiff's counsel and attempt to craft an argument that supports the general issues he has referenced in the most perfunctory manner. *See Alec F. v. Comm'r of Soc. Sec.*, No. 3:20-cv-467, 2022 WL 278307, at *2 n.4 (S.D. Ohio Jan. 31, 2022) (cleaned up) (*citing McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) ("Issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waives. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to put flesh on its bones.")). *See also Hollon v. Comm'r of Soc. Sec.*, 447 F.3d 477, 490 (6th Cir. 2006) ("This challenge warrants little discussion, as [plaintiff] has made little effort to develop this argument in her brief on appeal . . . ."). Thus, to the extent that Plaintiff's additional arguments were only set forth in a perfunctory manner, they are deemed forfeited.

[4] Because some documents are difficult to read, the parties refer to the author of one of the medical records at issue as "Dr. Holzapple" despite their uncertainty about the author's name. The Court does the same.

[5] A claimant's RFC is an assessment of "the most [he] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1).

erred when relying on interrogatory answers from a VE because the hypothetical questions in the interrogatories were flawed. (*Id*. at 13–14.)

## II.    THE ALJ'S DECISION

On January 25, 2022, ALJ Wells issued the fourth unfavorable determination. (R. 1239–67.) ALJ Wells initially determined that Plaintiff's date last insured was December 31, 2007, and thus, Plaintiff needed to establish disability on or before that date in order to be awarded DIB. (R. 1243, 1244.) At step one of the sequential evaluation process,[6] ALJ Wells found that Plaintiff had not engaged in substantial gainful activity from May 2, 2002, the alleged date of onset, through December 31, 2007, the date last insured. (R. 1244.) At step two, ALJ Wells found that Plaintiff had the following severe impairments: degenerative disc disease of the lumbar spine; avascular necrosis bilateral hips; major depressive disorder; and panic disorder. (*Id*.) At step three, ALJ

---

[6] Social Security Regulations require ALJs to resolve a disability claim through a five-step sequential evaluation of the evidence. *See* 20 C.F.R. §§ 404.1520(a)(4). Although a dispositive finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1. Is the claimant engaged in substantial gainful activity?

2. Does the claimant suffer from one or more severe impairments?

3. Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1?

4. Considering the claimant's residual functional capacity, can the claimant perform his or her past relevant work?

5. Considering the claimant's age, education, past work experience, and residual functional capacity, can the claimant perform other work available in the national economy?

*See* 20 C.F.R. §§ 404.1520(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

Wells found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments described in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 1245.)

Before proceeding to step four, ALJ Wells assessed Plaintiff's RFC as follows:

After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(b) and 416.967(b) except he could occasionally push and pull with the lower extremities, climb ramps and stairs, stoop, crouch, lift above the shoulder level, and reach below knee level. He could never crawl, kneel, or climb ladders, ropes, or scaffolds; and never work at unprotected heights or around dangerous moving machinery. He could attend and persist in order to complete simple and multi-step tasks in a setting that did not require sustained focus/attention of more than two hours at a time or sustained fast pace. He could interact with familiar coworkers and supervisors on a superficial basis but could never interact with the public. He could tolerate the stress and pressures associated with the routine environment where changes were infrequent and easily explained and there were no stringent time or production requirements.

(R. 1247.)

At step four, ALJ Wells relied on information provided by a VE in response to an interrogatory to find that Plaintiff was unable to perform his past relevant work as a truck driver. (R. 1257.) ALJ Wells also relied on the VE's testimony at step five to find that given his age, education, work experience, and RFC, jobs existed in significant numbers in the national economy that Plaintiff could perform. (R. 1257–58.) ALJ Wells, therefore, concluded that Plaintiff was not disabled from May 2, 2002, through December 31, 2007, his date last insured. (R. 1258.)

### III.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'" *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009)

(quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial. The Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).

Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'" *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right." *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007).

## IV.    ANALYSIS

As previously explained, Plaintiff argues that reversal is warranted for several reasons. All of Plaintiff's contentions of error are addressed in turn. Each is found wanting.

## A.    Medical Opinion Evidence

Plaintiff's contention of effort challenging the ALJ's consideration of the opinion evidence is unavailing.

6

An ALJ must consider all medical opinions that she receives in evaluating a claimant's case. 20 C.F.R. § 404.1527(c). The applicable regulations[7] define medical opinions as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions." 20 C.F.R. § 494.1527(a)(1).

### 1.      Treating Sources

Plaintiff challenges ALJ Wells' consideration of medical opinions from two treating sources, Drs. Popper and Davis. An ALJ generally gives deference to the opinions of a treating source "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a patient's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical filings alone . . . " 20 C.F.R. § 404.1527(c)(2); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 375 (6th Cir. 2013); *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009). If the treating physician's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the ALJ] will give it controlling weight." 20 C.F.R. § 404.1527(c)(2).

If the ALJ does not afford controlling weight to a treating physician's opinion, the ALJ must meet certain procedural requirements. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Specifically, if an ALJ does not give a treating source's opinion controlling weight:

[7] Because Plaintiff's application was filed prior to March 27, 2017, his claims are governed by regulations governing benefits claims made prior to that date.

> [A]n ALJ must apply certain factors—namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source—in determining what weight to give the opinion.

*Id.* Further, an ALJ must "always give good reasons in [the ALJ's] notice of determination or decision for the weight [the ALJ] give[s] your treating source's opinion." 20 C.F.R. § 404.1527(c)(2). Accordingly, the ALJ's reasoning "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550 (6th Cir. 2010) (internal quotation omitted). The United States Court of Appeals for the Sixth Circuit has stressed the importance of the good-reason requirement:

> "The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases," particularly in situations where a claimant knows that his physician has deemed him disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied." *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *See Halloran v. Barnhart*, 362 F.3d 28, 32–33 (2d Cir. 2004).

*Wilson*, 378 F.3d at 544–45. Thus, the reason-giving requirement is "particularly important when the treating physician has diagnosed the claimant as disabled." *Germany-Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (citing *Rogers*, 486 F.3d at 242). There is no requirement, however, that the ALJ "expressly" consider each of the *Wilson* factors within the written decision. *See Tilley v. Comm'r of Soc. Sec.*, 394 F. App'x 216, 222 (6th Cir. 2010) (indicating that, under *Blakley* and the good reason rule, an ALJ is not required to explicitly address all of the six factors within 20 C.F.R. § 404.1527(c)(2) for weighing medical opinion evidence within the written decision).

Nonetheless, the Sixth Circuit has set forth three possible scenarios that could lead the Court to a finding of harmless error where an ALJ violates the good reason rule. *Wilson*, 378 F.3d at 547. First, the Court indicated that harmless error might occur "if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it . . . . " *Id.* Second, the Court noted that if the ALJ's decision was "consistent with the opinion, it may be irrelevant that the ALJ did not give weight to the treating physician's opinion, and the failure to give reasons for not giving such weight is correspondingly irrelevant." *Id.* Third, the Court considered the possibility of a scenario "where the Commissioner has met the goal of § 1527(d)(2)—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Id.*

Finally, the Commissioner reserves the power to decide certain issues, such as a claimant's RFC. 20 C.F.R. § 404.1527(d). Although the ALJ will consider opinions of treating physicians "on the nature and severity of your impairment(s)," opinions on issues reserved to the Commissioner are generally not entitled to special significance. 20 C.F.R. § 404.1527(d); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

### a. Treating Source, Dr. Popper

Plaintiff asserts that ALJ Wells erred with regard to a number of opinions Dr. Popper authored before and after Plaintiff's date last insured. (Pl.'s Statement of Errors 4–5, ECF No. 10.) The Court disagrees.

### i. *Statements in Documents From Before the Date Last Insured That ALJ Wells Allegedly Ignored*

Both parties apparently agree that Dr. Popper was a treating physician—the record also reflects that Plaintiff sought treatment from Dr. Popper or his staff at least 31 time after the alleged date of onset but before the date last insured. (R. 437, 439, 440, 464, 443, 444, 445, 435,

755, 433, 432, 430, 425, 424, 419, 731, 730, 729, 727, 725, 724, 723, 721, 720, 716, 718, 714, 713, 709, 711, 708.) Plaintiff contends that ALJ Wells erred by ignoring Dr. Popper's medical opinions from this period. (Pl.'s Statement of Errors 4–5, ECF No. 10.) In particular, Plaintiff points to statements that appear in two treatment notes from this period and asserts that they constitute medical opinions, and thus, that ALJ Wells was required to give them controlling weight or provide good reasons for not doing so. (*Id.*) Defendant asserts that these statements do not constitute medical opinions, and therefore, they were not subject to the treating physician rule. (Def.'s Mem. in Opp'n 4–5, ECF No. 13.) The Court agrees that these statements do not constitute medical opinions subject to the treating physician rule, but that even if some do, any error was harmless.

For instance, Plaintiff points to a medical record dated August 4, 2005—approximately six weeks prior to his first of two hip replacement surgeries. (R. 1104.) In the section for "Subjective" notes, Dr. Popper wrote that Plaintiff anticipated seeing his orthopedic surgeon about a second hip surgery; he would most likely need both hips replaced; he had obtained a handicapped parking sticker for his car; and that he inquired about obtaining an electric wheelchair. (*Id.*) Under the heading for "Plan," Dr. Popper wrote that he would prescribe Plaintiff an electric wheelchair. (R. 1104.)

Plaintiff appears to assert that the references to the handicap parking sticker and the electric wheelchair in this August 4, 2005 treatment note are evidence of "significant work-related limitations," and thus, they constituted medical opinions. (Pl.'s Statement of Errors 4–5, ECF No. 10.) But as previously explained, a medical opinion is defined as a statement from an acceptable medical source that "reflect[s] judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s),

and your physical or mental restrictions." 20 C.F.R. § 404.1527(a)(1). Plaintiff's subjective report about obtaining a handicap parking sticker and his inquiry about an electric wheelchair do not constitute statements from an acceptable medical source.

In addition, even if Dr. Popper's August 4, 2005 prescription for an electric wheelchair could be construed as a medical opinion, the Court finds that any error was harmless because other records clarified that Dr. Popper's believed that Plaintiff might benefit from temporary use of a wheelchair. Specifically, on December 5, 2005, Dr. Popper wrote that Plaintiff "could use a motorized wheelchair for approximately three to six months" to help him recover from his upcoming bilateral hip replacement. (R. 1077.) Plaintiff has not demonstrated how ALJ Well's RFC determination—that Plaintiff was limited to a range of sedentary work—is inconsistent with that temporary use of an electric wheelchair. *Wilson*, 378 F.3d at 547.

Plaintiff also points to a treatment note dated July 19, 2007. (Pl.'s Statement of Errors 4, ECF No. 10.) Under the heading for "HPI," or "History of Present Illness," Dr. Popper wrote that Plaintiff reported that he had good days and bad days; medication helped him sleep; he was as active as possible; and that he was trying to maintain a home exercise program while waiting for the proper time to go forward with his second hip surgery. (R. 1012.) Plaintiff appears to assert that Dr. Popper's reference to Plaintiff's reports about having good and bad days constitutes a medical opinion. (Pl.'s Statement of Errors 4, ECF No. 10.) But Plaintiff's report that he had good and bad days does not constitute a statement from an acceptable medical source. 20 C.F.R. § 404.1527(a)(1).  Indeed, "[i]t is well settled that a physician's statement that 'merely regurgitates [a claimant's] self-described symptoms is 'not a medical opinion at all.'" *Butler v. Comm'r of Soc. Sec.*, Case No. 2:17-cv-10927, 2018 WL 5095046, at *8 (E.D. Mich. Aug. 6, 2018) (quoting

*Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011), *report and recommendation adopted*, 2018 WL 4203729 (E.D. Mich. Sept. 4, 2018).

Plaintiff also points to two treatment notes from prior to the date last insured but fails to indicate which statements in them allegedly constitute medical opinions. (Pl.'s Statement of Errors 4, ECF No. 10.) The Court observes, however, that in the first note, dated February 2, 2006, Dr. Popper wrote in an "Objective Findings" section that Plaintiff walked with a limp. (R. 727.) That statement does not constitute a medical opinion because it fails to describe Dr. Popper's judgments about the functional limits or abilities that flowed from that objective finding. *See*, *e.g., Collins v. Comm'r of Soc. Sec.*, Case No. 1:20-cv-1587, 2021 WL 4482780, at *15 (N.D. Ohio June 21, 2021) (finding that statements from treating physician did not constitute a medical opinion under 20 C.F.R. § 404.1527(a)(1) because they did not specify how the plaintiff's arthritis impaired her activities of daily living or her ability to perform work-related tasks or specify what she could do despite her limitations), *report and recommendation adopted*, 2021 WL 4478617 (N.D. Ohio Sept. 31, 2021); *Sulaka v. Comm'r of Soc. Sec.*, Case No. CV 16-13800, 2017 WL 8682368, at *4 (E.D. Mich. Sept. 29, 2017), (citing 20 C.F.R. §404.1527(a)(1) and finding that to be a medical opinion entitled to deference under the treating physician rule, a treating physician must describe what a plaintiff can do despite his impairments and specify his physical or mental restrictions), *report and recommendation adopted*, 2018 WL 97591 (E.D. Mich. Feb. 9, 2018). *Hawley v. Comm'r of Soc. Sec.*, Case No. 2:15-cv-12497, 2016 WL 8671206, at * 7 n.5 (E.D. Mich. July 22, 2016) (finding that treatment notes that did not "opine on what Plaintiff can do despite her symptoms" or "address what restrictions might be due to her alleged symptoms" were not a medical opinion pursuant to 20 C.F.R. §404.1527(a)(1)), *report and recommendation adopted*, 2016 WL 4536427 (E.D. Mich. Aug. 31, 2016). But even if that

objective finding could be construed as medical opinions, any error is harmless because Plaintiff has failed to demonstrate how a slight limp is incompatible with ALJ Well's determination that he was limited to a range of sedentary work. *Wilson*, 378 F.3d at 547.

The second note is dated October 11, 2007, four months prior to Plaintiff's second hip surgery. (R. 709.) In the "Objective" section of that document, Dr. Popper wrote that Plaintiff walked with a normal gait but still had pain with flexion of the right knee over the right hip area. (R. 709.) This statement does not constitute a medical opinion because it too fails to describe Dr. Popper's judgments about the functional limits or abilities that flowed from these objective findings. *See Collins*, 2021 WL 4482780, at *15; *Sulaka*, 2017 WL 8682368, at *4; *Hawley*, 2016 WL 8671206, at * 7 n.5. And again, even if those objective findings could be construed as medical opinions, any error is harmless because Plaintiff has failed to demonstrate how they are incompatible with ALJ Well's determination that he was limited to a range of sedentary work. *Wilson*, 378 F.3d at 547.

In short, the Court finds that statements in these documents authored by Dr. Popper before Plaintiff's date last insured do not constitute medical opinions, and thus, ALJ Wells was not required to assess and discuss them pursuant to the treating physician rule. To the extent some of these statements could be so construed, any error was harmless.

**ii.**      ***ALJ Wells' Discussion of Letter Authored by Dr. Popper Before the Date Last Insured***

Plaintiff next asserts that although ALJ Wells did not ignore a letter authored by Dr. Popper on September 14, 2004, ALJ Wells' discussion of the letter was inadequate because she failed to provide good reasons for declining to give it controlling weight. (Pl.'s Statement of Errors 5, ECF No. 10.) The Court does not agree.

The September 14, 2004 letter states:

> The above named patient, [Plaintiff], is under my medical care for a work related injury. [Plaintiff] is unable to work at any type of gainful employment at this time. We are awaiting approval for acupuncture therapy for this patient. I have taken him off work until after acupuncture therapy is completed.

(R. 434.) ALJ Wells discussed that letter and gave it little weight. She wrote:

> The undersigned has considered the one paragraph statement from Stephen Popper, DO, Ph.D., dated September 14, 2004 in connection with the claimant's workers' compensation claim (Exhibit 2, p. 25). Dr. Popper reported the claimant was unable to work at any type of gainful employment at that time. He noted he was awaiting approval for acupuncture therapy for the claimant and the claimant was "off work until after the acupuncture therapy was completed." The undersigned has given this statement little weight. First, it is obviously a temporary restriction and not intended as an opinion as to the claimant's residual functional status. In addition, treatment notes show the claimant experienced no neurological deficit, maintained a normal gait, and had normal range of motion with pain reported with internal rotation of the left leg and left knee flexion in the left hip (Exhibit 2F). Finally, a determination as to whether the claimant is disabled or unable to work is an issue reserved to the Commissioner. Therefore, opinions as to disability will not be given controlling weight.

(R. 1253–54.)

As this discussion demonstrates, ALJ Wells gave several reasons for deciding that Dr. Popper's letter was not entitled to controlling weight and was given little weight instead. For instance, ALJ Wells explained that a statement that someone is disabled or unable to work is a dispositive issue reserved to the Commissioner, and that such statements are not given controlling weight. (R. 1253–54.) And the governing regulations provide that a statement by a medical source that someone is disabled or cannot work is not a medical opinion because that is a dispositive issue reserved for the Commissioner. 20 C.F.R. § 404.1527(d)(1).

ALJ Wells also noted that the statements appeared to be about a temporary restriction as opposed to a residual functional status report. (R.1253–54.) Substantial evidence supports that explanation—the letter stated that Plaintiff was unable to perform any gainful employment *at that time*, and that Dr. Popper had written Plaintiff off work *until his acupuncture therapy was*

*completed.* (R. 434.) (emphasis added). These statements indicate that Dr. Popper was writing about restrictions that existed at the time of the letter and that were anticipated to last until certain treatments were completed.

ALJ Wells additionally explained that the letter was given little weight because treatment notes reflected certain examination findings. For example, ALJ Wells noted that examinations showed that Plaintiff maintained a normal gait. (R.1253–54.) The record reflects that Plaintiff was regularly found to have a stable gait (R. 454), a normal gait (R. 724, 723, 721), or a satisfactory gait (R. 1033), before his date last insured. Similarly, ALJ Wells noted that examinations found that Plaintiff had normal range of motion with pain reported with internal rotation. (R. 1253–54.) The record reflects that Plaintiff's range of motion in his hips was full on August 13, 2003, and May 14, 2004. (R. 480, 454.)

Accordingly, the Court also finds that the September 14, 2004 letter did not constitute a medical opinion, and thus, it was not subject to the treating physician rule. And although ALJ Wells opted to discuss it, she did not commit reversible error when doing so.

### iii. *Documents Authored by Dr. Popper After the Date Last Insured*

Plaintiff also points to statements in two medical records that were created by Dr. Popper after Plaintiff's date last insured. Plaintiff has not demonstrated, and the Court does not independently discern how these statements reflect Plaintiff's status prior to the date last insured. But even absent that hurdle, the Court finds that the statements do not constitute medical opinions subject to the treating physician rule.

In the first record, dated October 11, 2011, Dr. Popper wrote that he did not examine Plaintiff that day. (R. 677–78.) In the "History of Present Illness" section, Dr. Popper wrote that Plaintiff had "recently completed a functional capacity evaluation" and that "[i]n talking with the

therapist [Plaintiff] came out at a less than sedentary level." (*Id*.)[8] But Dr. Popper did not endorse or adopt that finding or opine a less-than-sedentary-level limitation into his treatment notes. (*Id*.) Rather, Dr. Popper simply described the findings from another person. (*Id*.) And his notes on that date do not, in any other way, include any functional limitations. (*Id*.) Nor do the notes in this document appear to relate to the period at issue. (*Id*.) Indeed, Dr. Popper noted in this October 11, 2011 record that the functional capacity evaluation was "recent." (*Id*.)

In the second document, a letter to counsel dated December 7, 2011, Dr. Popper wrote that his comments contained therein addressed Plaintiff's "Permanent Total Disability" and that Plaintiff became permanently totally disabled on November 3, 2011—almost four years after his date last insured. (R. 798–99.) This statement does not constitute a medical opinion because it constitutes a statement on an issue reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). But even if it could be construed as such, the statement tends to suggest that Dr. Popper did not believe that Plaintiff was permanently and totally disabled until well after Plaintiff's date last insured.

In sum, ALJ Wells did not commit reversible error by declining to give controlling weight to Dr. Popper's at-issue statements. This contention of error therefore lacks merit.

### b.    Treating Source, Dr. Davis

Plaintiff also asserts that ALJ Wells erred by ignoring an Adult Diagnostic Assessment Dr. Davis completed in 2009 after the date last insured and failing to give good reasons for

---

[8] It appears that Dr. Popper may have been referring to a functional capacity evaluation a physical therapist ("PT") completed on October 21, 2011. (R. 805–06.) In a summary of that evaluation, the PT wrote that Plaintiff would be "in an absolute lifting restriction" and that he would "need to undergo Vocational Rehab to be trained in jobs that would not require any lifting, pushing, or pulling (i.e., administrative work, desk/computer works, . . . etc. . . . .")." This suggests that the PT believed that Plaintiff might benefit from rehabilitation training for other work.

declining to give it controlling weight. (Pl.'s Statement of Errors 6, ECF No. 10.) The Court

disagrees.

The assessment at issue appears to have been used by Dr. Davis to collect data from

Plaintiff about his social life; education; employment and military history; mental health

treatment history; current medications; alcohol and drug use; and legal history. (R. 344–54.) The

assessment reflects that Plaintiff reported to Dr. Davis that his problems included depression-

related issues such as insomnia, feeling depressed daily, thoughts of worthlessness, fatigue, loss

of enjoyment, problems concentrating, and thoughts of suicide without intentions or plans of

acting on them. (R. 349, 351.) Plaintiff additionally reported panic attacks and ongoing feelings of

anger/aggression. (R. 349.) Plaintiff reported that he heard voices, or his own voice debating his

own thoughts. (R. 350.) He reported that his inability to work caused him psychosocial stress.

(*Id*.)

Dr. Davis then wrote a "narrative summary" based upon the information provided to him

by Plaintiff. (R. 352.) Dr. Davis wrote:

> [Plaintiff] was injured at work in 1995. He has been receiving BWC benefits off
> and on since then for injury of his spine. Steroid treatment of the injury caused a
> fifty pound weight gain and joint problems resulting in his receiving two artificial
> hips. The hip surgery caused problems with his bladder and breathing.
>
> The treatment of his spinal injury while at work in 1995 resulted in a number of
> additional medical problems. These medical problems have caused pain, the
> inability to work, financial problems and a decrease in activity including outdoor
> recreational activities that he enjoyed. As a result he developed . . . major
> depression, recurrent severe without psychotic features . . . . Panic disorder with
> agoraphobia needs to be ruled out as another consequence of his 1995 injury.

(R. 352.) Elsewhere in the document, Dr. Davis indicated that his primary Axis I diagnosis was

major depressive recurrent without psychosomatic features and that panic disorder with

agoraphobia needed to be "R.O.", or, presumably, ruled out. (R. 353.) Dr. Davis recommended individual counseling (R. 353, 354) but no "meds or somatic services" (R. 353).

Again, the parties appear to agree that Dr. Davis was a treating physician. But Defendant asserts, and the Court agrees, that this assessment does not constitute a medical opinion subject to the treating physician rule. First, the assessment generally does not include statements by Dr. Davis describing his judgments about Plaintiff's functional limits or abilities. *See Collins*, 2021 WL 4482780, at *15; *Sulaka*, 2017 WL 8682368, at *4; *Hawley*, 2016 WL 8671206, at *7 n.5. To the extent the narrative summary states that Plaintiff's medical problems caused an "inability to work," that statement is about an issue reserved to the Commissioner, and thus, it is not a medical opinion. 20 C.F.R. § 404.1527(d)(1). Moreover, the narrative summary explicitly indicates that it was "based upon on information provided" to Dr. Davis by Plaintiff. (R. 352.) As previously explained, however, a physician's recitation of a Plaintiff's self-described symptoms does not constitute a medical opinion. *Butler,* 2018 WL 5095048 at *8, *report and recommendation adopted*, 2018 WL 4203729 (cleaned up). Therefore, the statements in the narrative summary, including Plaintiff's reports about his inability to work, are not medical opinions.

Plaintiff also notes that Dr. Davis assessed a GAF score of 30 in the 2009 assessment. (Pl.'s Statement of Errors 6, ECF No. 10.) But "GAF scores do not constitute medical opinions." *Soto v. Comm'r of Soc. Sec.*, No. 17-10054, 2018 WL 2181098, at *5 (E.D. Mich. Mar. 2, 2018), *report and recommendation adopted*, No. 17-CV-10054, 2018 WL 1466087 (E.D. Mich. Mar. 26, 2018). Although an ALJ must assess medical opinions from a treating physician for controlling weight, an ALJ is not required "to put stock in a GAF score in the first place." *Id*. (quoting *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 511 (6th Cir. Feb. 9, 2006) (citing *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002))). Indeed, a

"GAF score does not reflect a clinician's opinion of functional capacity, and, therefore, an ALJ is

not required to consider it when determining a claimant's ability to work." *Id*. (quoting *Shorkey v.*

*Comm'r of Soc. Sec.*, 2014 WL 5361995, at *3 (E.D. Mich. Sept. 12, 2014), *report and*

*recommendation adopted*, 2014 WL 5362069 (E.D. Mich. Oct. 21, 2014) (citing *Howard v.*

*Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) (ALJ is not required to

consider GAF scores in assessing residual functional capacity))).

Plaintiff has also failed to demonstrate that the 2009 assessment relates to the period prior

to Plaintiff's date last insured. Plaintiff asserts that "Dr. Davis noted depression, panic disorder,

and agoraphobia related to the 1995-work injury." (Pl.'s Statement of Errors 6, ECF No. 10.) As

explained, however, the reference to Plaintiff's mental health issues being related to the 1995

injury was set forth in Dr. Davis' narrative summary of Plaintiff's statements. Therefore, Dr.

Davis' notation was based on statements made by Plaintiff and does not appear to represent Dr.

Davis' judgment about what caused Plaintiff's problems. (R. 352.) Dr. Davis also wrote in that

panic disorder with agoraphobia was a diagnosis that needed to be ruled out, not that Plaintiff

suffered from that condition. (R. 353.) To the extent, however, that Dr. Davis in fact diagnosed

panic disorder and major depression elsewhere in the document, ALJ Wells determined that

Plaintiff's severe medially determinable impairments included both of those conditions at step

two. (R. 1244.) Thus, even if this aspect of the 2009 assessment constitutes a medical opinion, it

was adopted such that any error would be harmless. *See Wilson*, 378 F.3d at 547.

In his Reply, Plaintiff points to other treatment notes from Dr. Davis created after the date

last insured and posits that they contain limitations that constitute opinions, and thus, ALJ Wells

erred by failing to evaluate them in accordance with the treating physician rule. (Pl.'s Reply 3,

ECF No. 14.) But a party cannot raise a new argument for the first time in a Reply. *Bishop v.*

*Oakstone Academy*, 477 F.Supp.2d 876, 889 (S.D. Ohio 2007). Accordingly, the Court finds that ALJ Wells did not err with respect to Dr. Davis's 2009 assessment and that Plaintiff's arguments lack merit.

### 2.    Non-Treating Sources

Plaintiff also submits that ALJ Wells erred by giving great weight to medical opinions from two doctors who performed consultative examinations in connection with Plaintiff's workers compensation claims before his date last insured. (Pl.'s Statement of Errors 7–8, ECF No. 10.) The Court does not agree.

An ALJ must consider all medical opinions that he or she receives in evaluating a claimant's case. 20 C.F.R. § 404.1527(c). But the "good reason" requirement does not apply where a medical source has not treated the claimant. *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010). Instead, an ALJ must apply the factors set forth in 20 C.F.R. § 404.1527(c), including the treatment relationship, supportability, consistency, and specialization of the source.

### a.    Dr. Rutherford

Plaintiff asserts that ALJ Wells erred when analyzing Dr. Rutherford's opinion. On February 23, 2007, Dr. Rutherford examined Plaintiff and opined that he was limited to sedentary activities with only occasional standing and walking; occasionally lifting and carrying up to 10 pounds; no climbing or crawling and only occasional bending; and no driving heavy machinery. (R. 1034.) ALJ Wells discussed Dr. Rutherford's examination and opinion as follows:

> The undersigned has considered the opinion of James Rutherford, M.D., dated February 23, 2007 (Exhibit 8F, pgs, 258-261). Dr. Rutherford conducted a disability examination at the request of the Ohio Bureau of Workers' Compensation. Upon examination, the claimant was noted to have a satisfactory gait. He was able to stand on his toes and heels and walk in a tandem fashion. He was able to do only 50% of a deep knee bend. On range of motion of the lower back, he had flexion of 50° with 60° being normal. He had extension of 10° and lateral flexion of 30° to each side. He had some tenderness in the mid thoracic area

and some tenderness in the lumbosacral area as well, Motor function in the lower extremities was intact on manual muscle testing. Sensory examination in the lower extremities was intact. On examination of the left hip, there was 0° of internal rotation and 30° of external rotation. There was 35° of abduction and 15° of adduction; 90° of flexion with no flexion contracture. On examination of the right hip, there was full extension with only 15° of flexion. There was external rotation of 20° and internal rotation of 5°; abduction of 30° and adduction of 10°. Dr. Rutherford noted the claimant was still being considered for a right total hip arthroplasty related to aseptic necrosis of the right femur. He also noted that since the claimant had a reasonably good result with his left total hip arthroplasty, he expected the claimant to have a reasonably good result with a right total hip arthroplasty. According to the examiner, without a right total hip arthroplasty, the claimant would be limited to sedentary activities. The undersigned has given this opinion great weight, as to the claimant's limitations to perform a range of sedentary level work. This is consistent with the overall evidence and consistent with the findings upon examination.

(R. at 1255.) As this discussion demonstrates, ALJ Wells determined that this opinion was entitled to great weight because it was consistent with the evidence of record and consistent with Dr. Rutherford's examination notes.

Plaintiff does not challenge that explanation. Instead, he maintains that Dr. Rutherford wrote in his assessment that Plaintiff reported that he "uses a cane most of the time" (R. 1032), and that ALJ Wells failed to account for Plaintiff's use of a cane when determining that he could perform unskilled sedentary work (Pl.'s Statement of Errors 7, ECF No. 10). But Dr. Rutherford did not opine that Plaintiff needed to use a cane— he merely noted that Plaintiff reported using one. (R. 1032.) In addition, during the examination, Dr. Rutherford found that Plaintiff had a satisfactory gait; he was able to stand on his toes and heels; and he could walk in a tandem fashion. (R. 1033.) In short, the Court cannot conclude that ALJ Wells was required to discount Dr. Rutherford's opinion because he failed to opine that a cane was medically necessary, or that by giving great weigh to Dr. Rutherford's opinion, ALJ Wells was required to incorporate use of a cane into Plaintiff's RFC.

Plaintiff additionally asserts that ALJ Wells erred by giving Dr. Rutherford's opinion great weight because Dr. Rutherford did not examine him for, and opine about, every condition he had, including urinary issues and "nervous" impairments. (Pl.'s Statement of Errors 7, ECF No. 10.) But an opinion need not address a claimant's every condition in order to be given substantial weight. Instead, an ALJ must consider the factors set forth in 20 C.F.R. § 404.1527(c) when assessing an opinion. Plaintiff does not argue that ALJ Wells failed to consider those factors.

Plaintiff also notes that Dr. Rutherford's opined limitations appeared to be temporary given that he acknowledged that Plaintiff was a candidate for a right hip replacement. (Pl.'s Statement of Errors 7, ECF No. 10; Pl.'s Reply 5, ECF No. 14.) But ALJ Wells noted that Dr. Rutherford opined about Plaintiff's capabilities without that surgery. (R. 1255.) Thus, ALJ Wells was clearly aware that Dr. Rutherford's opinion could change if Plaintiff had surgery. *Id*. And indeed, it appears that Dr. Rutherford anticipated that Plaintiff might be capable of greater activities after the hip replacement given that he opined that post-hip replacement vocational therapy should be "directed towards sedentary to light work activities." (R. 1034.) The Court, therefore, cannot conclude that ALJ Wells erred by affording great weight to Dr. Rutherford's opinion about Plaintiff's condition at the time he formulated his opinion, which was, notably, before Plaintiff' date last insured.

**b.    Dr. Holzapple**

Plaintiff also argues that ALJ Wells erred when analyzing Dr. Holzapple's opinion. On September 21, 2006, Dr. Holzapple examined Plaintiff and opined that he could not return to his prior position as a truck driver or heavy equipment operator even though he had reached maximal improvement after a left hip replacement because he still needed a right hip replacement. (R. 1043.) Dr. Holzapple further opined that Plaintiff needed vocational rehabilitation to allow him to return to a sedentary type of position with a 20-pound lifting restriction and no repetitive

stooping, squatting, or bending, and no work on heights or ladders. (*Id*.) ALJ Wells discussed Dr.

Holzapple's examination and opinion as follows:

> The undersigned has considered the September 21, 2006 opinion from a medical examiner dated September 21, 2006 (Exhibit 8F, pgs 267-270). The examiner conducted a disability examination at the request of the Ohio Bureau of Workers' Compensation. The claimant reported that he continued to have moderate right hip pain as well as chronic mid and low back pain. Upon examination, the claimant was noted to walk with a moderate antalgic gait due to right hip pain. He had pain in the mid and lower portion of his back to palpation. He could forward flex at 45 degrees, with lower back pain; straight leg raising was negative. Examination of the left hip showed good range of motion; the right hip showed hip flexion to 80 degrees, internal rotation to neutral, external rotation to 45 degrees and abduction of 30 degrees. According to the examiner, the treatment the claimant received for his bilateral avascular necrosis of the hips, including the left total hip replacement in September 2005 and further discussion for a right total hip replacement was appropriate and necessary. He agreed the claimant needed a right total hip replacement. Further, the examiner found the claimant had not reached maximum medical improvement for his left hip replacement, however, he was not at maximum medical improvement for his ongoing avascular necrosis of the right hip and would need a total hip replacement. According to the examiner, with vocational rehabilitation, the claimant could return to a sedentary type of position, with a twenty-pound lifting restriction; he could not perform any repetitive stooping, squatting or bending or work on heights or ladders. The undersigned has given this opinion great weight, as to the claimant's limitations to perform a range of sedentary level work. This is consistent with the overall evidence and consistent with the findings upon examination. However, a determination as to whether the claimant is unable to work or return to his past work is an issue reserved to the Commissioner.

(R. 1254–55.) As this discussion demonstrates, ALJ Wells determined that this opinion was

entitled to great weight because it was consistent with the evidence of record and consistent with

Dr. Holzapple's examination.

Plaintiff appears to challenge ALJ Wells' determination that Dr. Holzapple's opinion was

consistent with his examination notes. (Pl.'s Statement of Errors 7–8, ECF No. 10.) Specifically,

Plaintiff points out that Dr. Holzapple found that Plaintiff had an antalgic gait and limited motion

in his back. (*Id*.) But Dr. Holzapple appears to have considered both of those findings when

determining that Plaintiff would only be capable of sedentary work. (R. 1043.) And Plaintiff does

not demonstrate how those limitations are incompatible with sedentary work, which requires only occasional walking or standing. 20 C.F.R. § 404.1567(a). Thus, Plaintiff does not demonstrate how those findings fail to support Dr. Holzapple's opinion. Indeed, it appears that Dr. Holzapple's opinion that Plaintiff was limited to sedentary work may have been Dr. Holzapple's attempt to accommodate Plaintiff's antalgic gait given that Dr. Holzapple found that Plaintiff was capable of lifting 20 pounds, which is compatible with light work. 20 C.F.R. § 404.1567(b).

Plaintiff also appears to argue that ALJ Wells erred when affording Dr. Holzapple's opinion great weight because Dr. Holzapple did not specify what conditions he considered. (Pl.'s Statement of Errors 7, ECF No. 10; Pl.'s Reply 4, ECF No. 14.) But it is clear that Dr. Holzapple was asked to do an "Extent of Disability Examination." (R. 1041.) It is also clear that Dr. Holzaple was a medical doctor who performed a physical examination. (R. 1042.) Plaintiff also posits that ALJ Wells should not have given this opinion great weight because it does not elaborate on certain restrictions, such as how long Plaintiff could sit, stand, or walk. (Pl.'s Statement of Errors 8, ECF No. 10.) But an opinion does not have to be comprehensive in order to be afforded significant weight. Instead, an ALJ must apply the factors set forth in 20 C.F.R. § 404.1527(c). In any event, ALJ Wells did not adopt Dr. Holzapple's opinion in total. Instead, ALJ Wells explained that she gave the opinion great weight as to the claimant's limitations to perform a range of sedentary level work. (R. 1254–55.) ALJ Wells incorporated that portion of the opinion—that Plaintiff was capable of a range of sedentary work—into Plaintiff's RFC. And Plaintiff does not identify any limitations that Dr. Holzapple opined that ALJ Wells should have, but did not, incorporate into his RFC. Accordingly, Plaintiff's contention of error lacks merit.

## B.     Urinary Issues and Break Limitations

Plaintiff next argues that ALJ Wells erred with regard to his urinary impairments. (Pl.'s Statement of Errors 8–9, ECF No. 10.) Although not entirely clear, it appears that he contends

that ALJ Wells erred by failing to find that Plaintiff's urinary impairments were severe at step two[9] and by failing to incorporate into Plaintiff's RFC a limitation for extra bathroom breaks. This contention of error lacks merit.

A "severe impairment" is defined as "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). If a claimant has at least one severe medically determinable impairment, an ALJ must consider the limiting effects of all a claimant's medically determinable impairments, severe and not, when assessing a claimant's RFC. 20 C.F.R. § 404.1523.

Plaintiff bears the burden of proving the existence of a severe impairment that meets the twelve-month durational requirement. *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003); *Harley v. Comm'r of Soc. Sec.*, 485 F. App'x 802, 803 (6th Cir. 2012). The Sixth Circuit has construed a claimant's burden at step two as "a *de minimis* hurdle in the disability determination process." *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988). The inquiry is therefore "employed as an administrative convenience to screen out claims that are 'totally groundless' solely from a medical standpoint." *Id*. at 863 (quoting *Farris v. Sec'y of Health & Hum. Servs.*, 773 F.2d 85, 90 n.1 (6th Cir. 1985)). Notably, though, where the ALJ determines that a claimant has at least one severe impairment at step two, "the question of whether the ALJ characterized any other alleged impairment as severe or not severe is of little consequence." *Pompa v. Comm'r of Soc. Sec.*, 73 F. App'x 801, 803 (6th Cir. 2003). Instead, the pertinent inquiry is whether the ALJ considered the "limiting effects of all [of the claimant's] impairment(s), even those that are not severe, in determining [the claimant's] residual functional

---

[9] Plaintiff states that "[t]he ALJ did not find this in Finding Number 3" but appears to be referring ALJ Wells' step two determinations. (Pl.'s Statement of Errors 8, ECF No. 10.)

capacity." 20 C.F.R. § 404.1545(e); *Pompa*, 73 F. App'x at 803 (rejecting plaintiff's argument that the ALJ erred by finding that some of her impairments were not severe, where the ALJ determined that plaintiff had at least one severe impairment and considered all plaintiff's impairments in the RFC assessment); *Maziarz v. Sec'y of Health & Hum. Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (same).

The record reflects that Plaintiff first complained about his urinary retention issues before the date last insured. Specifically, Plaintiff had a left hip replacement surgery in September 2005. (R. 1079.) On January 17, 2006, Plaintiff reported to an examiner that he had a sensation of bladder retention in which he felt he could not empty his bladder. (R. 1065.) On May 2, 2006, Plaintiff reported to Dr. Popper that his major post-surgical complaint was symptoms of urinary retention that occurred after his surgery and that he experienced feelings of urgency but small amounts of voiding. (R. 725.)

Dr. Popper referred Plaintiff to urologist, Dr. Yodolowski, who examined Plainitff on July 24, 2006. (R. 725, 844.) Dr. Yodolowski advised Plaintiff to hydrate to increase his bladder capacity; hold back for two hours before voiding; and limit his fluid intake later in the day. (*Id.*) In March 2007, Plaintiff was examined by a CNP at Dr. Yodolowski's offices. (R. 841.) At that time, Plaintiff complained of urinary frequency with nocturia five times a night; voiding in small amounts; and hesitancy with weak stream. (R. 841.) He was trialed on Vesicare, and advised again about progressive voiding to try and stretch his bladder. (R. 842.) During a follow up appointment with Dr. Yodolowski on May 2, 2007, however, Dr. Yodolowski wrote that Plaintiff had "marvelous improvement" in just one month's time with the Vesicare alone. (R. 843.) Plaintiff was again advised to hydrate and increase the times between voiding in order increase his bladder capacity. (*Id.*)

On November 8, 2007, Plaintiff reported that he was still having problems with voiding secondary to his past surgery. (R. 711.) And during a pre-operative visit which took place on January 18, 2008—after his date last insured—Plaintiff informed a provider that he had developed urinary retention issues after his first hip replacement surgery. (R. 970–71.) Accordingly, the provider started Plaintiff on Flomax before his second hip replacement was scheduled to take place. (R. 970, 973.) On March 27, 2008, Dr. Popper wrote that Plaintiff reported that Flomax had been especially helpful in resolving his problem. (R. 947.) Similarly, Dr. Popper wrote on May 13, 2008, that Plaintiff reported that Flomax was effectively treating his condition. (R. 701.) On June 19, 2008, Plaintiff reported that he was having urinary retention issues again but that he could not afford Flomax. (R. 698.) Dr. Popper wrote a letter with justification for the prescription and referred Plaintiff to another urologist for a second opinion. (*Id*.) On August 15, 2008, an examiner wrote that a review of Plaintiff's systems was "very positive from a urologic . . . point of view." (R. 934.) On November 13, 2008, Dr. Popper wrote that Plaintiff reported that his some symptoms, "such as going to the bathroom," had gotten better. (R. 932.)

On March 27, 2009, Plaintiff was examined by a second urologist, Dr. Gilleran. (R. 862.) After examination and testing, Dr. Gilleran wrote that he Plaintiff had a remote history of mild urethral trauma; he suspected that Plaintiff may have a small stricture or web; and that Plaintiff would be brought back for a cystoscopy with the possibility of a urethrogram if a stricture was discovered. (R. 863.) On May 22, 2009, however, a cystoscopic exam revealed that Plaintiff had no strictures but that he did have a small urothelial tumor, which Dr. Gilleran thought was likely to be bladder cancer. (R. 898.) Plaintiff was scheduled for cystoscopy transurethral resection of the bladder tumor. (*Id*.) But Plaintiff reported that he was not going to have the surgery. (R. 899.)

On August 17, 2010, Plaintiff again complained about bladder issues to Dr. Popper and attributed them to his second surgery. (R. 744.) On August 31, 2010, Plaintiff reported that he had issues with midsleep awakening or bathroom trips. (R. 847.) On September 21, 2010, Plaintiff reported to Dr. Popper that he was frustrated with ongoing problems with urination. (R. 742.) Dr. Popper noted that no follow up had been done after Dr. Gilleran discovered some type of bladder mass. (*Id*.) Dr. Popper referred Plaintiff to another urologist to try and "pull everything together." (R. 743.) An examiner on February 14, 2011, noted, however, that Plaintiff had refused further investigation and treatment for his bladder tumor. (R. 830.)

At an evaluation in March 2012, Plaintiff indicated that he used Flomax because his bladder was "screwed up" in his first surgery. (R. 778.) On April 5, 2012, a provider noted that Plaintiff had problems with urination but was using tamsulosin (a.k.a. Flomax) which helped with urination and that he had just been put on Synthroid. (R. 1128.) On June 8, 2012, Plaintiff denied any changes in his bladder or bowel habits. (R. 1132.) On September 19, 2012, Plaintiff reported no changes in urinary frequency and no dysuria. (R. 1233.)

At step two, ALJ Wells determined that Plaintiff's urinary retention issues were not severe. (R. 1245.) ALJ Wells wrote as follows:

> The evidence indicates that the claimant developed problems with urinary retention after his first hip surgery in 2005. Treatment records indicate this has been ongoing since September 22, 2005. The claimant reported problems with feelings of urgency going to the bathroom, and only a small amount of voiding. The condition has been evaluated and he is treated with Flomax. According to the claimant, this has been very helpful in resolving the problem (Exhibits 5F & 7F). The evidence does not indicate the claimant is significantly limited in his ability to perform a variety of work or work-like activities due to this condition. Therefore, it is found to be non-severe.

(R. 1245.) The Court finds that the record substantially supports ALJ Wells' determination that Plaintiff's urinary issues were not severe. ALJ Wells arrived at that conclusion because

medication appears to have helped him control the condition both before and after the date last insured. The record supports that rationale. Specifically, the record reflects that before the date last insured, Plaintiff had "marvelous improvement" after one month of using Vesicare. (R. 843.) The record further reflects that after his date last insured, Plaintiff experienced good results with Flomax (R. 947, 701) and that he was doing better (R. 934, 932). Although Plaintiff did not follow up after Dr. Gilleran's testing revealed a tumor or mass, the record reflects that in 2012, he continued to experience good results with Flomax (R. 1128), and he denied changes to bladder habits and urinary frequency (R. 1132, 1233).

Plaintiff nevertheless asserts that ALJ Wells erred because Plaintiff testified that he would go to the bathroom frequently, and thus, ALJ Wells was required to "deal with" Plaintiff's frequent bathroom use by incorporating into his RFC a limitation for extra bathrooms breaks. (Pl.'s Statement of Errors 9, ECF No. 10.) But Plaintiff does not acknowledge the record evidence indicating that Plaintiff's urinary retention issues were controlled by medications when Plaintiff took them. Moreover, the record is bereft of any documentation reflecting that a doctor ever opined that Plaintiff needed extra bathroom breaks. Accordingly, the Court finds that although the record could have supported the inclusion of an extra bathroom break limitation into Plaintiff's RFC, on this record, ALJ Wells did not commit reversible error by omitting one. Therefore, this contention of error lacks merit.

**C.      Social Functioning Limitations**

Plaintiff also argues that ALJ Wells erred in several ways when incorporating social interactions into his RFC. (Pl.'s Statement of Errors 9–10, ECF No. 10.) These contentions of error likewise lack merit.

State agency psychologist, Dr. Semmeleman, opined that Plaintiff was capable of superficial interactions with familiar co-workers and supervisors but that he should *avoid*

interactions with the general public and would perform best in a solitary setting. (R. 74, 94.) ALJ Wells determined that Dr. Semmeleman's opinion was entitled to great weight, and when assessing Plaintiff's RFC, she determined that Plaintiff was limited to superficial interactions with familiar co-workers and supervisors but that he could *never* interact with the public. (R. 1247.)

Plaintiff argues that ALJ Wells erred because she failed to incorporate into his RFC a restriction to solitary work as opined by Dr. Semmeleman. (Pl.'s Statement of Errors 9–10, ECF No. 10.) But Dr. Semmeleman did not opine that Plaintiff was *only* capable of solitary work. Instead, Dr. Semmeleman opined that Plaintiff would "perform best" in a solitary setting. (R. 74, 94.) And the ALJ's assessment of Plaintiff's RFC reflects the *most* he can do despite his limitations, not what the ideal conditions might be. *See* 20 C.F.R. §§ 404.1545(a)(1); 416.945(a)(1). Moreover, it appears that ALJ Wells determined that Plaintiff was somewhat more limited than Dr. Semmeleman opined because Dr. Semmeleman opined that Plaintiff should *avoid* interactions with the public, while ALJ Wells found that Plaintiff could *never* interact with the public. (R. 1247.) Accordingly, this contention of error is not well taken.

ALJ Wells also asked a VE, via an interrogatory, if a hypothetical person with Plaintiff's social interaction limitations, including a limitation to superficial interactions with familiar co-workers and supervisors, could perform any unskilled occupations with jobs that existed in the national economy. (R. 1731–32.) The VE indicated that, yes, such a person could perform the jobs of table worker, inspector, and sorter, of which there were with 25,000, 75,000, and 50,000 jobs in the national economy, respectively. (R. 1732.) Plaintiff argues that this was error because ALJ Wells failed to define "superficial social interactions" in the interrogatory, citing cases finding that superficial interactions differ from "occasional interactions" in that the former refers

to the quality of contacts while the latter refers to the quantity of contacts. (Pl.'s Statement of Errors 10, ECF No. 10.)

Although Plaintiff correctly notes that Courts have found that those two types of interactions are not the same, Plaintiff's reliance on those cases is misplaced. In those cases, an ALJ gave great weight to an opined restriction to superficial interactions but then incorporated into a plaintiff's RFC a limitation to occasional or infrequent interactions without adequately explaining why he or she converted a superficial interaction to an occasional or infrequent interaction, possibly because the ALJs in those cases conflated the interaction types. *See, e.g.*, *Corey v. Comm'r of Soc. Sec.*, No. 18-cv-1219, 2019 WL 3226946, at *4 (S.D. Ohio July 17, 2019); *Lindsey v. Comm'r of Soc. Sec.*, No. 2:18-cv-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30. 2018), *report and recommendation adopted*, 2019 WL 133177 (S.D. Ohio Jan. 8, 2019). Such is not the case here. Dr. Semmeleman opined that Plaintiff was limited to superficial interactions with familiar co-workers and supervisors. (R. 74, 94.) ALJ Wells found that opinion persuasive and incorporated it *verbatim* into Plaintiff's RFC. The hypothetical posed to the VE via an interrogatory presumed a person with that same superficial interaction limitation. In short, because ALJ Wells did not convert a persuasive superficial interaction limitation into an occasional interaction limitation, the cases cited by Plaintiff are readily distinguishable.

Plaintiff also argues that ALJ Wells erred by relying on the VE's testimony to find that Plaintiff could perform entry-level work. Specifically, Plaintiff asserts that when the VE responded to the hypothetical question about a person who was limited to superficial interactions with familiar coworkers and supervisors, the VE identified only entry-level jobs, and that because they were entry level, if Plaintiff performed them, he would necessarily encounter unfamiliar coworkers and supervisors. (Pl.'s Statement of Errors 9–10, ECF No. 10.) Defendant contends,

and the Court agrees, that an entry-level job is not the same as being new to a job. (Def.'s Mem. in Opp'n 13–14, ECF No. 13.) An entry-level job, rather, appears to relate to the amount of skill or time required to learn how to perform a job rather than an employee's tenure. And, as Defendant notes, an RFC represents an individual's "maximum" ability to perform sustained work in an ordinary setting on a regular and continuing basis, which means eight hours a day for five days a week. *See* SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996). Therefore, even though coworkers and supervisors might be unfamiliar when a person is new at an entry-level job, those coworkers and supervisors would not remain so after a person performed that entry-level job on a regular and continuing basis, even if the job remained entry level.

Regardless, the VE indicated that a hypothetical person who was limited to superficial interactions with familiar coworkers and supervisors would be able to perform work as a table worker, inspector, and sorter, and that there were no conflicts between this information and the Dictionary of Occupational Titles. (R. 1732, 1733.) Plaintiff points to no evidence that undermines that information or suggests that these entry-level jobs necessarily entailed contact with unfamiliar coworkers and supervisors. Accordingly, this contention of error lacks merit.

## D.    Subjective Complaints

Plaintiff also contends that ALJ Wells erred when performing a subjective symptom analysis (a.k.a "credibility determination"). (Pl.'s Statement of Errors 11–12, ECF No. 10.) This contention of error likewise lacks merit.

When a claimant alleges symptoms of disabling severity, an ALJ must follow a two-step process for evaluating those symptoms. *See* 20 C.F.R. §§ 404.1529; 416.929(c)(1); SSR 16–3p, 2017 WL 5180304, at*10 (Oct. 25, 2017). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to

produce a claimant's symptoms. Second, the ALJ "must . . . evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1); 416.929(c)(1).

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must consider all available evidence from medical and nonmedical sources including medical opinions. *Id*. In addition, there are seven factors set forth in SSR 16–3p[10] that an ALJ will consider: 1) daily activities; 2) the location, duration, frequency, and intensity of pain or other symptoms; 3) factors that precipitate and aggravate the symptoms; 4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; 5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; 6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and 7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms. SSR 16–3p, 2017 WL 5180304 at *7–8; *see also* 20 C.F.R. § 404.1529(c)(3). Although an ALJ is not required to analyze all seven factors, he should show that he considered the relevant evidence. *Roach v. Comm'r Soc. Sec.*, No. 1:20-CV-01853-JDG, 2021 WL 4553128, at *10–11 (N.D. Ohio Oct. 5,

---

[10] SSR 96-7p, 1996 WL 374186 (July 2, 1996), which has been superseded by SSR 16-3p, required an ALJ to evaluate the overall credibility of a plaintiff's statements. In contrast, SSR 16-3p requires an ALJ to evaluate the *consistency* of a plaintiff's statements, without reaching the question of overall *credibility*, or character for truthfulness. 2017 WL 5180304, at *11 ("In evaluating an individual's symptoms, our adjudicators will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation. The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person."). The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word credibility . . . to clarify that the subjective symptoms evaluation is not an examination of an individual's character." *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016). Therefore, the credibility determination and subjective symptom analysis are not materially different, and case law regarding the former applies with equal force to the latter.

2021). Indeed, an ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16–3p, 2017 WL 5180304 at *10.

Here, ALJ Wells summarized Plaintiff's statements about the intensity, persistence, and limiting effects of his physical and mental health impairments. ALJ Wells first summarized Plaintiffs testimony from a hearing in January 2018 as follows:

> The claimant testified at the prior hearing in January 2018 he has a history of hip pain, for which he has undergone hip replacement surgery and cortisone injections. He acknowledged his procedures improved his pain, but claimed he continued to have difficulty moving around. He declared he was experiencing "a lot of pain" during the period at issue. The claimant also relayed a history of depression. Functionally speaking, the claimant alleged difficulty standing for prolonged periods, indicating his ability to do so "depends on the day." He estimated he could sit for 20 to 30 minutes. He stated he was unable to lift any amount after his initial hip surgery.

(R. 1247–48.) ALJ Wells also summarized Plaintiff's other testimony and statements as follows:[11]

> He testified previously he had difficulty with his memory and difficulty being around others (see also Exhibit 3E for prior reports of functional abilities). Regarding activities of daily living, the claimant testified he had a driver's license and was able to drive "all the time." In his 2012 Function Report, the claimant also reported generally maintaining personal care, assisting with household chores, preparing simple meals, and going out to eat (Exhibit 3E).

---

[11] Plaintiff asserts that ALJ Wells erred because she "only reviewed the testimony at the 2018 prior hearing" and Plaintiff's 2012 Function report. (Pl.'s Statement of Errors 11, ECF No. 10.) It is well established, however, that an ALJ is not required to "discuss every piece of evidence in the record to substantiate [her] decision." *Conner v. Comm'r of Soc. Sec.*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004)); *see also Dykes ex rel. Brymer v. Barnhart*, 112 F. App'x 463, 467–68 (6th Cir. 2004) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." (citations omitted)). Regardless, ALJ Wells first summarized Plaintiff's 2018 testimony and then noted that Plaintiff had "testified previously that he had difficulty with his memory and difficulty being around others." (R. 1248.) ALJ Wells' reference to the fact that Plaintiff "testified previously" appears to refer to Plaintiff's testimony from the 2014 hearing. (R. 40, 46.)

(R. 1248.) ALJ Wells then summarized the medical records. (R. 1248–50.) That summary

included the following discussion:

> In December 2007, the claimant reported medications helped with his chronic pain
> (Exhibit 8F). Examination showed pain with abduction and adduction against
> resistance of the upper extremities in the mid-thoracic area, but his pain level was
> noted to have decreased. The evidence indicates that subsequent to the claimant's
> complaints of right hip pain, he underwent total right hip replacement in February
> 2008 (Exhibit 7F). Although this surgery was after the claimant's date last insured
> (December 31, 2007), the evidence indicates the claimant history of complaints
> prior to that date. However, as noted above, when the claimant was seen in October
> 2007, prior to the surgery, the claimant reported he had pain over the right hip area
> but admitted he did not get refills on his prescriptions, which may have contributed
> to his complaints of pain. He reported that he had pain relief when taking his
> medication. On examination, the claimant walked with a normal gait (Exhibit 7F).
> Follow-up treatment records after the surgery and after the claimant's DLI, indicate
> the claimant continued to complain of pain in the hip (Exhibit 7F, March 2008, May
> 2008, & November 2008). He was treated with pain patches and TENS unit.
> According to the claimant, his symptoms increase with activities. An examiner
> noted the claimant was not doing any kind of treatment to resolve his symptoms
> "other than time apparently."
>
> The claimant underwent relatively conservative treatment for his alleged pain. He
> reported improvement in his condition following his initial hip surgery despite not
> attending physical therapy sessions (Exhibit 7F). He was treated with a TENs
> unit, injections, and medications, all of which he reported improved his pain
> (Exhibits 2F & 7F).

(R. 1250.) ALJ Wells then determined that Plaintiff's statements about the intensity, persistence,

and limiting effects of his physical impairments were not entirely consistent with the record

evidence. ALJ Wells explained:

> While the claimant did experience pain and limitation due to his impairments, he
> was frequently described as in no acute distress during examination. He did use a
> cane after hip surgery, which is to be expected. Prior to this, reportedly he did not
> meet the criteria for use of a wheelchair/scooter, and one was not necessary
> (Exhibits 7F and 8F). Prior to surgery and after recovery, the claimant's gait was
> generally normal (Exhibits 2F, 5F, 7F, and 8F). His impairments support sedentary
> work, but do not support further limitation than in the residual functional capacity
> assessment because he showed no neurological, strength, or reflex abnormalities,
> and he experienced no atrophy showing there was no denervation and the claimant
> was not in such significant pain he stopped using his muscles for movement.

(R. 1251.)

As this discussion demonstrates, ALJ Wells cited a number of record-based reasons why the record did not fully support Plaintiff's statements about the intensity, persistence, and limiting effects of his physical impairments. For example, ALJ Wells explained that Plaintiff received relatively conservative treatment for his pain, including a TENS Unit and medication. (R. 1250.) Type of treatment is an appropriate factor for consideration. SSR 16–3p, 2017 WL 5180304 at *7–8. Substantial evidence also supports ALJ Wells' determination. As ALJ Wells noted, Plaintiff's pain, both before and after the date last insured, was treated with a TENS Unit. (*Id.*) And the record documents Plaintiff's regular use of a TENS Unit and that at various times he reported 50% (R. 981, 951, 942), 60% (R. 570, 544, 542, 526, 517, 503, 496, 491, 483, 481, 479), or 70% (R. 822, 804) pain relief with its use; that the TENS Unit helped with his pain symptoms (R. 435); and that the TENS Unit worked very well (R. 738).

As ALJ Wells also correctly explained, Plaintiff used medications to treat his pain, and he reported improvements with that treatment. (R. 1250.) Effectiveness of treatment is an appropriate consideration. SSR 16–3p, 2017 WL 5180304 at *7–8. Moreover, substantial evidence supports ALJ Wells' explanation. On February 24 and April 8, 2004, Plaintiff reported that Vicodin was helping with his pain and that his pain was better with Vicodin. (R. 464, 443.) On April 2, 2004, Dr. Popper wrote that Plaintiff had started to show modest improvements with pain management and treatment. (R. 462.) On September 16, 2004, Plaintiff reported that when his medications worked, they were helpful in taking the "edge off" his pain. (R. 754.) On November 4, 2004, Plaintiff reported significant improvements in his pain control with the addition of Cataflam and Vicodin. (R. 431.) On February 10, 2005, Plaintiff was reportedly doing well on his medications without any problems. (R. 424.) After his first hip surgery in September 2005, but before his date

last insured, Plaintiff also reported that Vicodin was working for him although the BWC would not pay for it. (R. 727.) On November 2, 2006, Plaintiff reported that his pain medications were doing very well for him and that although his pain was longer lasting, it was at a lower level. (R. 721.) On March 15, 2007, Plaintiff was doing well with pain management. (R. 716.) On October 11, 2007, Plaintiff noted pain over his right hip but that he had not obtained medication refills. (R. 709.) On December 6, 2007, he reported that Imipramine had helped with his chronic pain. (R. 708.) Upon examination, Dr. Popper found that Plaintiff's pain level had decreased. (*Id.*) After his December 31, 2007 date last insured, and after his second hip surgery in February 2008, Plaintiff reported that he went off his medications; Dr. Popper wrote that Plaintiff reported that he was not using any treatment to resolve his symptoms except "time." (R. 932.) On March 20, 2012, Dr. Popper wrote that Plaintiff's pain management allowed him to continue activities of daily living with no significant side effects. (R. 735.)

Plaintiff asserts that ALJ Wells erred when finding that Plaintiff's treatments were conservative given that he had a left hip replacement before his date last insured and a right hip replacement after his date last insured. (Pl.'s Statement of Errors 11–12, ECF No. 10.) But ALJ Wells did not find that Plaintiff's treatments for his underlying impairments were conservative. Rather, ALJ Wells found that Plaintiff's received relatively conservative treatment for his *pain*, and that Plaintiff seemed to respond to those conservative pain treatments. As detailed above, the record substantially supports that finding.

ALJ Wells additionally explained that examination findings did not entirely support his Plaintiff's subjective statements. (R. 1250.) For instance, ALJ Wells correctly noted that examinations routinely found that Plaintiff was not in acute distress. (*Id.*) Substantial evidence also supports that determination. Examiners before the date last insured regularly noted that

Plaintiff was not in acute distress or was not in a high-level of distress. (R. 662, 430, 415, 844, 841, 656.) Likewise, other examiners noted that Plaintiff did not always appear to be in pain before his date last insured. On June 6, 2002, a provider noted that Plaintiff looked better that day; very tanned; and that he did not look to be in pain. (R. 531.) On February 19, 2004, Dr. Popper wrote that Plaintiff showed minimal signs of discomfort for someone who reported having a 7 to 8 out of 10 baseline level of pain. (R. 440.) On February 24, 2004, Dr. Popper wrote that Plaintiff appeared more comfortable and relaxed and that he was able to move without much discomfort. (R. 464.) During examinations after the date last insured, examiners also noted that Plaintiff did not appear to be in acute distress, apparent distress, or in distress. (R. 952, 905, 788, 1148, 1234, 1237.)

ALJ Wells noted too that before his first hip surgery and after his recovery period, Plaintiff's gait was generally normal. (R. 1251.) Substantial evidence supports that determination. The record reflects that Plaintiff's gait was noted to be normal or stable before his first hip surgery. (R. 443, 454.) Plaintiff's gait was noted to be within normal limits or normal after his first surgery. (R. 1066, 724, 723, 721, 716, 709.) Indeed, and as ALJ Wells noted, the BWC determined that a wheelchair was not warranted prior to Plaintiff's first surgery (R. 1094–95), and Dr. Popper determined that one might be warranted only temporarily to help him recover after his bilateral hip replacement (R. 1077).

ALJ Wells also explained that examinations did not find neurological, strength, or reflex abnormalities, or atrophy suggesting that his pain caused him to stop using his muscles for movement. (R. 1250.) Substantial supports that explanation as well. Neurological examinations before the date last insured revealed normal and symmetrical reflexes (R. 437, 454); normal muscle tone (R. 454); and grossly intact sensation (R. 455). Examinations before the date last

insured also found that Plaintiff exhibited good strength (R. 533, 437, 455, 419), 4/5 strength (R.

720), or 5/5 strength (R. 1066). Later examinations found that Plaintiff had 5/5 strength (R. 701,

932) and no evidence of atrophy (R. 928).

ALJ Wells also found that with regard to his mental health impairments, Plaintiff had no

more than moderate limitations. (R. 1250.) ALJ Wells wrote:

> As for the claimant's mental impairments, the record supports a finding of no more
> than moderate mental limitation. Records dated February 2002 note the claimant
> endorsed depressive symptoms related to his pain including anhedonia; yet no
> specific psychiatric abnormalities were documented (Exhibit 2F). In April 2002,
> the claimant complained of increasing problems with depression, however, the
> record is largely absent mental complaints until January 2004, at which time he
> again complained of depression with associated difficulty concentrating,
> irritability, and difficulty sleeping. He was continued on Zoloft. Additional records
> dated June 2006 note the claimant's mood and affect were grossly unremarkable
> (Exhibit 8F). In August 2017, the claimant was noted to have a depressed mood
> (Exhibit 8F). In November 2007, the claimant reported feeling frustrated and
> depressed regarding his ongoing symptoms; however, by the following month, he
> admitted to feeling better emotionally (Exhibit 7F). Furthermore, the claimant has
> not required psychiatric hospitalization and appears to have undergone only
> conservative treatment prior to the date last insured.

(*Id.*)

As this discussion demonstrates, ALJ Wells gave several record-based reasons for finding

that the record supported a finding that Plaintiff's mental health impairments did not result in

more than moderate limitations. First, ALJ Wells explained that the record is largely absent of

mental health complaints until January 2004. (*Id.*) That accurately describes the record evidence.

As ALJ Wells noted, in January 2004, Plaintiff expressed that his depression was getting worse.

(R. 437.) But as ALJ Wells also noted, subsequent examinations before the date last insured

generally did not reflect abnormal mental health findings. Indeed, at least two such examinations

noted that Plaintiff's mood and affect were grossly unremarkable. (R. 843, 844.) And as ALJ

Wells explained, although Plaintiff expressed that he was depressed and frustrated about his

ongoing symptoms in November 2007 (R. 711), the following month he reported that he was feeling better emotionally (R. 708).

ALJ Wells also noted that Plaintiff's activities were not entirely consistent with his statements about the intensity, persistence, and limiting effects of his symptoms. ALJ Wells wrote:

> Other factors further support a finding the claimant is not disabled. For example, the claimant's own reports of functioning are inconsistent with his allegations of disability. In his Function Report, the claimant reported he was capable of performing several activities of daily living, including driving, preparing simple meals, maintaining personal care, and going out to eat (Exhibit 3E). Although this report was made following his date last insured, it is presumed, in conjunction with his testimony, that he was able to perform such tasks during the period at issue. Therefore, given the signs and findings on examinations, diagnostic tests, treatment history, the claimant's own reports of functioning, the undersigned finds the claimant remained capable of performing a reduced range of sedentary level work, as detailed in the above residual functional capacity (RFC) assessment. The postural, environmental, and mental limitations adequately address the claimant's complaints of pain and limitation during the period at issue.

(R. 1250.) It is appropriate for an ALJ to consider a claimant's daily activities. SSR 16–3p, 2017 WL 5180304 at *7–8.

Plaintiff nevertheless asserts that ALJ Wells erred when finding that his daily activities undermined his subjective complaints. (Pl.'s Statement of Errors 12, ECF No. 10.) Specifically, Plaintiff appears to complain that ALJ Wells cherry-picked statements from his 2012 Function Report that suggested that his activities were robust while ignoring statements to the contrary. (Pl.'s Reply 7, ECF No. 14.) But an allegation of "cherry picking" is seldom successful because crediting it would require a court to re-weigh record evidence." *DeLong v. Comm'r of Soc. Sec. Admin.*, 748 F.3d 723, 726 (6th Cir. 2014); *see also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009) ("[W]e see little indication that the ALJ improperly cherry picked evidence; the same process can be described more neutrally as weighing the evidence."). And the Court is

not convinced of cherry picking in this instance. ALJ Wells explained that in the 2012 Function Report, Plaintiff indicated that he drove, prepared simple meals, maintained personal care, and went out to eat. (R. 1250.) A review of the 2012 Function Report demonstrates that Plaintiff indicated that he drove (R. 277); microwaved meals that his wife prepared for him even though he could no longer cook (R. 276); showered even though he could no longer get in or out of a bathtub to take a bath (R. 275); and that his wife "made him get out of the house to go eat with her" (R. 276). In short, the Court does not find that ALJ Wells' description misrepresented the information found in the 2012 Function Report.

Moreover, the Court notes that other record evidence demonstrates that prior to his date last insured, Plaintiff was independent in his ADLs (R. 662, 656), and that after his date last insured, Plaintiff was able to provide for his own sustenance, leave home and transport himself a couple times a day, mow the lawn, and do laundry twice a week (R. 847, 848). He also reported actively socializing two to three days a week. (R. 848.) In February 2011, Plaintiff reported trying to help with his newborn child, doing some household chores, and participating in more activities with his family. (R. 832.) In March 2011, he reported occasionally going to the movies, playing with his infant son daily, and visiting a depressed friend several times to cheer him up. (R. 825.)

In short, although ALJ Wells did not discuss every piece of evidence in the record, her findings demonstrate that she considered the record as a whole when determining that the alleged intensity, persistence, and limiting effects of Plaintiff's subjective symptoms were not borne out by the record. Plaintiff's contention of error lacks merit.

**E.      Reliance on the VE's Testimony**

Plaintiff contests the validity of the hypothetical questions posed to the VE via interrogatories, and to which the VE responded with information indicating that Plaintiff was

capable of performing a significant number of jobs. (Pl.'s Statement of Errors 13–14, ECF No. 10.) This contention of error lacks merit.

An ALJ may use the services of a VE at steps four and five to determine if claimant can perform his past relevant work, or other work given his employment profile. Nevertheless, "[i]n order for a vocational expert's testimony in response to a hypothetical question to serve as substantial evidence in support of the conclusion that a claimant can perform other work, the question must accurately portray a claimant's physical and mental impairments." *Ealy,* 594 F.3d at 516. Here, Plaintiff contends that ALJ Wells failed to include various limitations in her hypothetical question to the VE, including, but not limited to, a ten-pound lifting restriction; a limitation to be allowed to walk around during an 8-hour workday; a limitation for absenteeism; and a limitation for extra breaks. (Pl.'s Statement of Errors 13–14, ECF No. 10.) But ALJ Wells' hypothetical question contained all the limitations that she found to be credible and supported by the evidence, and therefore, it was proper. *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) (explaining that when formulating a hypothetical, an ALJ is only "required to incorporate those limitations accepted as credible by the finder of fact"). Accordingly, the ALJ did not err when relying on the VE's response to her hypothetical question.

## V.    CONCLUSION

In sum, the Court finds that none of Plaintiff's contentions of error have merit. Therefore, the Court **AFFIRMS** the Commissioner's non-disability determination and **OVERRULES** Plaintiff's Statement of Errors.

**IT IS SO ORDERED.**

/s/ *Chelsey M. Vascura*
CHELSEY M. VASCURA
UNITED STATES MAGISTRATE JUDGE